EOI CORP., Plaintiff,

v.

**MEDICAL MARKETING LTD.,**
**et al., Defendants.**

**Civil Action No. 96–4961(AET).**

United States District Court,
D. New Jersey.

Feb. 27, 1997.

Thomas Ermi, Duane, Morris & Heckscher, Cherry Hill, for Plaintiff.

Charles J. Vinicombe, Drinker, Biddle & Reath, Princeton, for Defendants.

## ORDER

WOLFSON, United States Magistrate Judge.

This matter having been opened to the Court by Charles J. Vinicombe of Drinker, Biddle, & Reath, on behalf of defendant, Medical Marketing International Limited ("MMI"), for an Order quashing service of process, and the Court having considered the moving, opposition, and reply papers, and the Court further having entered a Memorandum on this date setting forth the Court's decision in this matter, which is being consid-

ered pursuant to *Fed.R.Civ.P.* 78, and for good cause shown,

IT IS on this 27th day of February, 1997,

ORDERED that defendant MMI's motion to quash plaintiff's service of process is denied; and it is further

ORDERED that defendant MMI shall file its Answer within thirty (30) days from the date of this Order.

## MEMORANDUM

Presently before the Court is the motion by defendant, Medical Marketing International Limited ("MMI"), seeking an Order quashing service of process of the Complaint for failing to comply with the mandates of the Hague Convention. The court has considered the moving, opposition, and reply papers, and decides this matter pursuant to *Fed.R.Civ.P.* 78. For the following reasons, defendant's motion to quash service of process is denied.

### Background

The present action arises out of a contract dispute between plaintiff EOI Corp. ("EOI"), a corporation with its primary offices in New Jersey, and MMI, a corporation with its principal place of business in England, United Kingdom.[1] EOI filed its Complaint against MMI, Sohrab Darougar, and I.O. International Limited, in the District Court of New Jersey on October 2, 1996. Thereafter, on October 9, 1996, the Clerk of the Court issued a summons, pursuant to *Fed.R.Civ.P.* 4(b), for defendants MMI and Sohrab Darougar. EOI then sent a copy of the Summons, Complaint, and Acknowledgment of Service to MMI via DHL, a commercial package delivery service, and by regular mail. EOI Brief at 2. On October 14, 1996, DHL served the papers at Highfields House, 2 High Street, Little Shelford, Cambridge, England, which is the private residence of David Best, MMI's Managing Director. EOI Brief at 2 and Corresponding Exhibit A; Certification of Margaret Smart Best ("M. Best Certification") at 2. DHL left the papers with Marga-

---

1. MMI's principle place of business is located at: St. John's Innovation Centre, Cowley Road, Cambridge CB4 4WS, England, United Kingdom.

ret Smart Best[2], David Best's wife, who accepted and signed for the package. M. Best Certification at 1–2.

MMI brings the present motion to quash EOI's service of process by mail, alleging that EOI's choice of service by DHL delivery violated both *Fed. R. Civ. P.* 4(h)(2) and Hague Convention Article 10(a). Relying upon *Bankston v. Toyota Motor Corp.*, 889 F.2d 172 (8th Cir.1989), and its progeny, MMI submits that the plain language of the Hague Convention distinguishes between "service" by mail and the "sending" of subsequent judicial documents by postal means; the former, which was utilized here, is not authorized under Article 10(a) of the Hague Convention. MMI Brief at 4–10. In the alternative, MMI suggests that in the event that this Court finds that Article 10(a) does permit service by post, that Article should be read in conjunction with *Fed.R.Civ.P.* 4(f)(2), "which provides that service may be made by 'any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served.'" MMI Brief at 10–11. Having failed to effectuate service through the Clerk of the Court, as required by *Fed.R.Civ.P.* 4(f)(2)(C)(ii), MMI argues that EOI's attempted service was invalid. *Id.*

Following the dividing line already drawn by many courts and commentators, EOI disagrees sharply with MMI's interpretation of Article 10(a) of the Hague Convention, insisting that, in light of *Ackermann v. Levine*, 788 F.2d 830 (2d Cir.1986), and its progeny, this provision does contemplate and permit service of process by postal means. EOI Brief at 3–11. Consequently, EOI urges this Court to find that it properly served MMI in accordance with Article 10(a) of the Hague Convention.

**Discussion**

Pursuant to Federal Rule of Civil Procedure 4(h)(2), service[3] upon a foreign corpora-tion, from which a waiver of service has not been obtained and filed, shall be effected by any manner prescribed for service upon individuals in a foreign country detailed in Federal Rule of Civil Procedure 4(f), except that personal delivery is not permitted. Rule 4(f) offers several options for serving a foreign litigant, including "by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents" *Fed.R.Civ.P.*4(f).[4] Hence, courts have concluded that "the Convention supplements—and is manifestly not limited by—Rule 4." *Ackermann v. Levine*, 788 F.2d at 840.

**1. The Hague Convention and the Article 10(a) Controversy**

There is no dispute that the Hague Convention rules regarding service of process are applicable here. The Hague Convention, adopted in 1965, had as its purpose the creation of an "appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time." Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638, 658 U.N.T.S. 163 (hereinafter "Hague Convention"); the full text of the Hague Convention has also been reprinted in the United States Code Service (U.S.C.S.) on International Agreements at 265–310. The approximately thirty-two signatory countries, including the United States and the United Kingdom (the countries implicated in the instant dispute), are obligated to abide by the Convention rules. As a ratified treaty, the Convention is the supreme law of the land, and maintains controlling effect. *See* U.S. Const. Art. VI, cl. 2; *Ackermann v. Levine*, 788 F.2d at 838; *American Trust Co. v. Smyth*, 247 F.2d 149, 152 (9th Cir.1957); *See also R. Griggs Group*

---

**2.** Margaret Smart Best holds no position at MMI.

**3.** "'Service of process' is the formal delivery of documents that are deemed legally sufficient to charge the defendant with notice of a pending action." *R. Griggs Group Limited v. Filanto Spa*, 920 F.Supp. 1100, 1103 (D.Nev.1996); *See also Volkswagenwerk Aktiengesellschaft v. Schlunk,*

486 U.S. 694, 700, 108 S.Ct. 2104, 2108, 100 L.Ed.2d 722 (1988).

**4.** Rule 4(f) also provides two alternative means to effectuate service, both of which do not apply here.

*Limited v. Filanto Spa,* 920 F.Supp. 1100, 1102 (D.Nev.1996) (where the Hague Convention applies, its provisions are mandatory, and failure to comply voids the attempted service).

The Hague Convention authorizes several different mechanisms for effectuating service of process. The primary vehicle, established in Articles 2 through 7, requires each participating country to set up a Central Authority to monitor and ensure proper service.[5] However, the Convention does not limit litigants to serve process exclusively through the Central Authority. Several other articles which establish equally permissible and valid alternative measures for service in a foreign country, include: Articles 8 and 9, which allow service through diplomatic or consular agents;[6] Article 11 empowers the signatory countries to agree to any other method of service not specifically provided for in the Convention;[7] and Article 19 provides for service by any means envisioned by the internal laws of the country in which service is made.[8] The most hotly disputed method of service, incorporated in Article 10(a), has captured the attention of many courts, as well as scholars, and is at issue here.

■ Article 10 states:

Provided the State of destination does not object, the present Convention shall not interfere with—

(a) **the freedom to send judicial documents, by postal channels, directly to persons abroad,**

(b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

(c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

The United States did not object to any of the provisions detailed in Article 10, *Ackermann,* 788 F.2d at 839; however, the United Kingdom objected to sections (b) and (c).[9]

5. The Central Authority receives requests for service from other contracting states. The process requires a competent judicial officer or authority of the originating state to transmit the documents to be served, including a request form, to the receiving state's Central Authority. The Central Authority reviews the request and promptly notifies the applicant of any defects. Once satisfied with the request, the Central Authority will then serve the papers or arrange for them to be served through an appropriate agency by a method permitted by the receiving country's internal law or by the method requested by the applicant so long as it is consistent with the internal law. Upon properly completing service, the Central Authority must certify that the documents were served, including all of the pertinent details concerning the service. The cost of making service through these means is significant; several years ago, the costs approximated $800–$900. *Gapanovich v. Komori Corporation,* 255 N.J.Super. 607, 614, 605 A.2d 1120 (App.Div.1992); *See also,* L. Andrew Cooper, *International Service of Process by Mail under the Hague Service Convention,* 13 Mich. J. Int'l L. 698, 716 (1992).

6. Article 8 states, in pertinent part, that "[e]ach contracting State shall be free to effect service of judicial documents upon persons abroad, without application of any compulsion, directly through its diplomatic or consular agents," provided that the State is not opposed to such service within its territory. Similarly, Article 9 affords each contracting State the opportunity "to use consular channels to forward documents, for the purpose of service, to those authorities of another contracting State which are designated by the latter for that purpose," and "[e]ach contracting State may, if exceptional circumstances so require, use diplomatic channels for the same purpose."

7. Article 11 provides that "[t]he present Convention shall not prevent two or more contracting States from agreeing to permit, for the purpose of service of judicial documents, channels of transmission other than those provided for in the preceding articles and, in particular, direct communication between their respective authorities."

8. "To the extent that the internal law of a contracting State permits methods of transmission, other than those provided for in the preceding articles, of documents coming from abroad, for service within its territory, the present Convention shall not affect such provisions." Hague Convention at Article 19.

9. The United Kingdom specifically declined to adopt Article 10(b) and (c), holding instead that "documents for service through official channels will be accepted in the United Kingdom only by the central or additional authorities and only from judicial, consular, or diplomatic officers of other Contracting States." Hague Convention, Ancillary Laws and Directives, *reprinted in* U.S.C.S. on International Agreements at 301.

Hague Convention, Ancillary Laws and Directives, *reprinted in* U.S.C.S. on International Agreements at 301; *See also* G. Brian Raley, *A Comparative Analysis: Notice Requirements in Germany, Japan, Spain, The United Kingdom and The United States,* 10 Ariz. J. Int'l & Comp. L. 301 (1993). Since, neither country specifically objected to Article 10(a), it is applicable in matters between these two nations.

The controversy concerning Article 10(a) focuses on the divergence in the interpretation of one word—send. In particular, courts are divided on whether the phrase, "freedom to **send** judicial documents," was intended to include service of process. Two distinct lines of authority have developed on this issue; one supports the position that service by mail is authorized by Article 10(a), *see Ackermann,* 788 F.2d 830, and the other advocates the position that Article 10(a) does not endorse service by postal channels, *see Bankston,* 889 F.2d 172.

### a. The *Ackermann* Approach

Led by the Second Circuit Court of Appeals and followed by a host of other jurisdictions, is the position that Article 10(a) contemplates and authorizes service of process by mail. *See,* e.g., *Ackermann,* 788 F.2d at 838; *R. Griggs Group Limited v. Filanto Spa,* 920 F.Supp. 1100; *Zisman v. Sieger,* 106 F.R.D. 194 (N.D.Ill.1985); *Chrysler Corp. v. General Motors Corp.,* 589 F.Supp. 1182 (D.D.C.1984); *Weight v. Kawasaki Heavy Indus.,* 597 F.Supp. 1082 (E.D.Va. 1984).[10] These courts, relying upon commentaries to the Hague Convention and considering the overall purpose and scope of the treaty, have held that "the word 'send' in Article 10(a) was intended to mean 'service' ". *Ackermann,* 788 F.2d at 839. For example, the *Ackermann* court acknowledged that the

leading commentator on the Convention, Brian Ristau,[11] reviewed the Rapporteur's report on the final text of the Convention and reached the 'inescapable' conclusion that use of 'send' rather than the otherwise consistently used 'service' must be attributed to careless drafting. *Id.* (citing 1 B. Ristau, International Judicial Assistance (Civil and Commercial) § 4–10 at 132 (1984)). Consequently, courts insist that any other interpretation "would be superfluous unless it was related to the sending of such documents for the purpose of service." *Ackermann,* 788 F.2d at 839 (quoting *Shoei Kako Co. v. Superior Court,* 33 Cal.App.3d 808, 821–22, 109 Cal.Rptr. 402 (1973)).

In its exhaustive analysis, the court in *R. Griggs* scrutinized the Hague Convention treaty, and determined that service by mail is consistent with the overriding purpose of the Convention to develop a comprehensive system to effectuate proper service of process in other countries. *R. Griggs,* 920 F.Supp. at 1104–05. While the bulk of the treaty, Articles 2 through 7, requires the signatory countries to establish a Central Authority to process service, many of the remaining Articles, including Articles 8, 9, 10, 11, and 19, all propose alternate mechanisms for service. *Id.* "In this context, it is not surprising or incongruous that mail service would be another option available to the transnational litigant." *Id.* at 1105. Indeed, according to this Nevada district court, Article 10(a) would be out of place in Article 10 and in the entire Convention, if it did not relate to "sending" judicial documents for the purpose of "serving process." *Id.* at 1104.

The *R. Griggs* court further recognized that, "in the interpretation of treaties, courts are obliged to consider not only the text, but the 'context in which the words are used,' "

---

10. *See also Coblentz GMC/Freightliner, Inc. v. General Motors Corp.,* 724 F.Supp. 1364, 1372 (M.D.Ala.1989), *aff'd. without opt,* 932 F.2d 977 (11th Cir.1991); *Patty v. Toyota Motor Corp.,* 777 F.Supp. 956, 959 (N.D.Ga.1991); *Meyers v. AS-ICS Corp.,* 711 F.Supp. 1001, 1007–1008 (C.D.Cal.1989); *Smith v. Dainichi Kinzoku Kogyo Co.,* 680 F.Supp. 847, 850–51 (W.D.Tex.1988); *Montgomery, Zukerman, Davis, Inc. v. Diepenbrock,* 698 F.Supp. 1453, 1461 (S.D.Ind.1988); *Newport Components, Inc. v. NEC Home Elecs., Inc.,* 671 F.Supp. 1525, 1542 (C.D.Cal.1987).

11. Bruno Ristau, former Director of the Office of Foreign Litigation, U.S. Department of Justice, served as the United States representative to two Special Commissions convened by the Hague Conference on Private International Law to study and improve the implementation by member states of the Hague Service and Evidence Conventions. *R. Griggs,* 920 F.Supp. at 1106 n. 9.

including the history of the treaty, the negotiations, and the practical construction adopted by the parties. *Id.* at 1105 (quoting *Volkswagenwerk*, 486 U.S. at 699, 108 S.Ct. at 2108). With this mandate in mind, the court reviewed the text of the treaty and determined that 10(a)'s departure from the use of the term "service" was not singular. *R. Griggs*, 920 F.Supp. at 1105. While it is true that the principle term used to describe the process of legally notifying a defendant of an action is "service", other terms are also used in the Convention to describe the same process. *Id.* For example, Article 21's reference to "methods of transmission" is synonymous with "service". *Id.* Hence, it is reasonable that the drafters simply varied the language in the text when discussing service.

That conclusion is buttressed by the position taken by the United States State Department. Subsequent to the *Bankston* decision,[12] the State Department's legal advisor countered that "the *Bankston* decision ... is incorrect to the extent that it suggests that the Hague Convention does not permit as a method of service the sending of a copy of the summons and complaint by registered mail to a defendant in a foreign country." Letter from Alan J. Kreczko, U.S. Department of State Deputy Legal Advisor, to the Administrative Office of the United States Courts and the National Center for State Courts (March 14, 1991), excerpted at 30 I.L.M. 260 and cited in *R. Griggs*, 920 F.Supp. at 1106.

A close reading of the Convention and the accompanying declarations similarly reveal that, at least some of the signatories understood that Article 10(a) constituted an alternative method of service. *See*, e.g., Hague Convention, Ancillary Laws and Directives,

*reprinted in* U.S.C.S. on International Agreements at 282 ("Canada does not object to service by postal channels.") and U.S.C.S. on International Agreements at 287 (The Czech Republic objected to Article 10(a) stating that "judicial documents may not be served by another contracting State through postal channels ...").[13]

A number of scholarly law review articles have also interpreted Article 10(a) as permitting service by post. *See*, e.g., Patricia N. McCausland, *How May I Serve You? Service of Process by Mail under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, 12 Pace L.Rev. 177 (1992); Craig R. Armstrong, *Permitting Service of Process By Mail on Japanese Defendants*, 13 Loy. L.A. Int'l & Comp. L.J. (1991); Franklin B. Mann, Jr., *Foreign Service of Process by Direct Mail under the Hague Convention and the Article 10(a) Controversy: Send v. Service*, 21 Cumb. L.Rev. 647 (1990/1991); Gary A. Magnarini, *Service of Process Abroad Under the Hague Convention*, 71 Marq. L.Rev. 649 (1988). According to these commentators, persuasive extra-judicial interpretations of Article 10(a) of the Hague Convention advocate the use of postal channels to effectuate service of process.

For instance, in 1977, a Special Commission, composed of eleven representatives, including members from the United States and the United Kingdom, was formed to evaluate the practical effects of the Convention. Permanent Bureau Report on the First Special Commission, 17 I.L.M. 319 (1978) (hereinafter "First Special Commission Report"). After discussing the pertinent issues at length, the Permanent Bureau[14] summarized the meeting in a report which specified that

12. The Eighth Circuit held, in *Bankston v. Toyota Motor Corporation*, 889 F.2d 172 (8th Cir.1989), that 10(a) does not contemplate service of process by mail.

13. Egypt, Germany, Norway, and Turkey also objected to the application of Article 10(a). Hague Convention, Ancillary Laws and Directives, reprinted in U.S.C.S. on International Agreements at 288, 291–92, 296, and 300.

14. In 1951, the Hague Conference members created a Charter and an intergovernmental agency

with a Permanent Bureau. Leo Gross & Kurt H. Nadelmann, *Book Review of Conference De La Haye De Droit International Prive. Actes et Documents De La Quatorzieme Session (1980). Book IMatieres Diverses; Book IIVentes Auz Consommateurs. The Hague*, 1982, 77 Am. J. Int'l L. 944 (1983). The Bureau arranges for periodic meetings of officials from the signatory states and monitors the grievances of these countries. Susan Burke, *The Increasing Focus of Public Int'l Law on Private Law Issues*, 86 Am. Soc'y Int'l L. Proc. 456 (1992).

"[t]he States which object to the utilisation ... of service by post sent from abroad are known thanks to the declarations made to the Ministry of Foreign Affairs.... It was determined that most of the States made no objection to the service of judicial documents coming from abroad directly by mail in their territory." *Id.* One commentator suggests that "[t]hese statements are an explicit recognition that the declarations made by states with respect to Article 10(a) refer to service of process through postal channels as opposed to the mailing of follow-up documents." McCausland, 12 Pace L.Rev. at 192.

Twelve years later, in 1989, the Special Commission was reconvened to discuss the practical effect and applicability of the Hague Convention. Permanent Bureau Report on the Second Special Commission, 28 I.L.M. 1556 (1989) (hereinafter "Second Special Commission Report"). Again the Commission noted that "the postal channel for service constitutes a method which is quite separate from service via the Central Authorities or between judicial officers. Article 10(a), in effect, offered a reservation to Contracting States to consider that service by mail was an infringement of their sovereignty. Thus, theoretical doubts about the legal nature of the procedure were unjustified. Nonetheless, certain courts in the United States of America ... had concluded that service of process abroad by mail was not permitted under the Convention." *Id.* at 1561. The Second Commission's endeavor to settle the Article 10(a) dispute was apparently unconvincing as courts have continued to struggle with these issues.

Also in 1989, the Committee on the Federal Courts of the New York Bar Association issued a report providing a practical guide for service of process abroad. Service of Process Abroad: A Nuts and Bolts Guide, 122 F.R.D. 63 (1989). The report listed the various alternatives available, under the Hague Convention, for service upon foreign litigants, including service by mail where the foreign state has not objected to such service. *Id.* at 70. Thus, the Committee expressly rejected a more restrictive reading of article 10(a). *Id.* at 79.

The Practical Handbook on the Operation of the Hague Convention, produced in cooperation with the signatory states, similarly attempted to quell the controversy by offering a guide to service of process under the Convention. Practical Handbook on the Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (Hague Conference on Private International Law)(1983)(hereinafter "Handbook") at V. The Handbook details the alternative methods available to effectuate proper service, and specifically lists service by post as a potential alternative. *Id.* Moreover, the Handbook identifies which countries have objected to Article 10(a) and which have not. Based upon the Handbook's assessment, both the United Kingdom and the United States failed to present any opposition to service by post as detailed in Article 10(a).

Additional persuasive evidence of the intended scope of Article 10(a) can be found in the negotiation transcript of the treaty contained in the Travaux Preparatories. McCausland, 12 Pace L.Rev. at 195 (citing, 3 Actes et Documents de la Dixieme Session (Conference de la Haye de Droit International Prive) (1964)) (hereinafter "Actes et Documents") at 90. Apparently, both the 1905 and 1954 Conventions permitted service of process by mail. McCausland, 12 Pace L.Rev. at 195 (citing Actes et Documents at 82). Several years later, over the vehement objection from the German delegate who sought to abolish the alternative, the 1964 Convention incorporated provision Article 10(a) permitting service of process by post unless a state expressly objected to its use. *Id.* at 195 (citing Actes et Documents at 90, 236–37).

### b. The *Bankston* Approach

Conversely, the second line of authority, advocated by the Eighth Circuit Court of Appeals and a number of district courts, ascribes to the antithetical interpretation; that Article 10(a) does not sanction service of process by means of postal channels. *See, e.g. Bankston,* 889 F.2d 172; *Golub v. Isuzu Motors,* 924 F.Supp. 324 (D.Mass.1996); *Raffa v. Nissan Motor Co. Ltd.,* 141 F.R.D. 45

(E.D.Pa.1991); *Hantover, Inc. v. Omet*, 688 F.Supp. 1377, 1385 (W.D.Mo.1988); *Pochop v. Toyota Motor Co.*, 111 F.R.D. 464, 466 (S.D.Miss.1986).[15] These courts, adhering to a literal interpretation of the Hague Convention treaty, have found that the word "send" in Article 10(a) is not equivalent to "service of process," and further that the inclusion of the word "service" in other sections, including Article 10(b) and (c), is evidence of the drafters' intention to distinguish between "sending" judicial documents and "serving" process. *See e.g., Bankston*, 889 F.2d at 173–74. Where a legislative body "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislative body] acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* at 174 (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)). Hence, "subscribers to this interpretation maintain that Article 10(a) merely provides a method for sending subsequent documents after service of process has been obtained by means of the central authority." *Id.* at 174.[16]

Furthermore, these courts have found it unlikely that the Convention, which laboriously developed complex and elaborate procedures for service of process, including the creation of a Central Authority and other intricate methods for proper service, would permit litigants to circumvent these procedures simply "by sending something through the mail." *Golub*, 924 F.Supp. at 327; *Raffa*, 141 F.R.D. at 47. Several legal commentators have supported this view as well. *See*, e.g., L. Andrew Cooper, *International Service of Process By Mail Under the Hague Service Convention*, 13 Mich. J. Int'l. L. 698 (1992); Jeffrey S. Ahearn, *International Law—Service of Process—Interpretation of the Word "Send" in Article 10(a) of the Hague Convention*, 14 Suffolk Transnat'l L.J. 672 (1991); Michael H. Altman, *Mailing Service to Japan: Does Article 10(a) of the Hague Convention Authorize A Separate Method?*, 69 Wash. U.L.Q. 635 (1991); Peter D. Trooboff, *Hague Service Convention—Scope and Application—Role of Internal Law*, 82 Am. J. Int'l. L. 816 (1988).

In contrast to those commentators adhering to the position that service by mail is an available option, some theorists contend that Article 10(a) is not the product of "careless drafting" as Bruno Ristau has suggested. Cooper, 13 Mich. J. Int'l. L. at 706–08; *See supra*, at 137–38. In evaluating Article 10(a) of the Convention, Ristau apparently relied upon a prior draft of the treaty and its accompanying report to determine the drafters' intent. Cooper, 13 Mich. J. Int'l. L. at 706–708 (quoting Bruno Ristau, International Judicial Assistance, Civil and Commercial (1990) at 149). The draft report, translated by Ristau, suggests that service by mail was to be permitted. *Id.* According to at least one commentator, Ristau's reliance may have been unfounded since the delegates of the Convention voted only to approve the final Convention and its accompanying report, and not the drafts of these documents. *Id.* Hence, this author posits that it is unclear whether the delegates understood the final draft of Article 10(a) to permit service by post. *Id.*

### c. Article 10(a) Does Permit Service By Postal Channels

■ The United States Supreme Court and the Third Circuit Court of Appeals have not yet addressed this thorny issue.[17] In the

---

15. *See also Brand v. Mazda Motor*, 920 F.Supp. 1169 (D.Kan.1996); *Gonnuscio v. Seabrand Shipping Ltd.*, 908 F.Supp. 823 (D.Or.1995); *Peabody Holding Co., Inc. v. Costain Group PLC*, 808 F.Supp. 1425 (E.D.Mo.1992); *Gallagher v. Mazda Motor*, 781 F.Supp. 1079 (E.D.Pa.1992); *Soupart v. Houei Kogyo Co.*, 770 F.Supp. 282 (W.D.Pa.1991); *Wilson v. Honda Motor Co.*, 776 F.Supp. 339 (E.D.Tenn.1991); *Wasden v. Yamaha Motor Co.*, 131 F.R.D. 206 (M.D.Fla.1990).

16. The *Bankston* court was particularly concerned with permitting service by mail to Japanese litigants, in light of their internal Japanese

law proscribing domestic litigants from availing themselves of this method of service. *Bankston*, 889 F.2d at 174. The court further found it unlikely that Japan would object to the more formal modes of service detailed in sections (b) and (c) of Article 10, but permit the informal method of service by mail arguably prescribed in Article 10(a). *Id.*

17. Plaintiff cites two cases, the Supreme Court's decision in *Volkswagenwerk*, 486 U.S. 694, 108 S.Ct. 2104, 100 L.Ed.2d 722, and the Third Circuit Court's holding in *Umbenhauer v. Woog*, 969 F.2d 25 (3d Cir.1992), as supporting its conclu-

absence of any controlling authority, this court finds the position articulated by the *Ackermann* court and its progeny to be persuasive and consistent with the goals of the Hague Convention.

That Article 10(a) of the Hague Convention permits service of process by mail is supported by the overwhelming weight of scholarly authority in the field, and fosters the Convention's primary objectives—"[d]esiring to create appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time [and] [d]esiring to improve the organization of mutual judicial assistance for that purpose by simplifying and expediting the procedure." Hague Convention, Preamble, *reprinted in* U.S.C.S. on International Agreements at 265.

This Court is not persuaded by those authorities who have applied a strict statutory construction of the treaty, and have interpreted Article 10(a) as permitting only the "sending" of post-service judicial documents and not "service of process." Indeed, there is a paucity of analysis in the majority of these cases. *See Bankston*, 889 F.2d at 172–74; *Golub*, 924 F.Supp. at 326–28; *Hantover*, 688 F.Supp. at 1384–85.

Furthermore, as one theorist proposes, the "plain meaning" of Article 10(a) actually permits service of process. Armstrong, 13 Loy. L.A. Int'l & Comp. L.J. at 586. The text of Article 10 states: "[p]rovided the State of destination does not object, the present Convention shall not interfere with(a) the **freedom to send judicial documents, by postal channels, directly to persons abroad.**" The word "send" as defined by Webster's Dictionary means "to cause to go; . . . to dispatch by a means of communi-

cation; . . . to cause to be carried to a destination . . ." Webster's Ninth New Collegiate Dictionary (1985). Further evaluation reveals that a summons and complaint, documents which when properly dispatched and accepted constitute sufficient service of process, are judicial documents. Black's Law Dictionary defines "judicial" as ". . . relating to or connected with the administration of justice . . . [o]f or pertaining or appropriate to the administration of justice, or courts of justice, or a judge thereof, or the proceedings therein. . . ." Black's Law Dictionary (5th ed.1979). Document is defined as "[a]n instrument on which is recorded, by means of letters, figures, or marks, the original, official, or legal form of something, which may be evidentially used." *Id.* Clearly, a summons and complaint are legal forms pertaining to a proceeding intended to administer justice. Hence, they are judicial documents. Thus, the plain language of Article 10(a) permits sending service of process through postal channels. If the drafters did not intend for Article 10(a) to include service of process, they could have altered the plain meaning of the text to qualify that a summons and complaint are not "judicial documents," in the context of the Treaty. Having not done so, this Court is directed to the conclusion that Article 10(a) permits service by postal channels, unless a signatory state specifically objects.

Moreover, if Article 10(a) were not intended to refer to service, but only to the "sending" of subsequent judicial documents, conducting litigation with foreigners would be severely burdensome, if not impossible. In effect, litigants suing individuals from objector states, such as the Czech Republic, Egypt, Norway, Germany and Turkey, after

sion that Article 10(a) of the Hague Convention permits postal service. EOI Brief at 9–11. However, neither of these decisions are helpful to the Court's inquiry here. In *Volkswagenwerk*, the Supreme Court provides an instructive evaluation of the Hague Convention, but the Court does not speak definitively to the disputed issue of whether Article 10(a) permits service by mail. Likewise, the Third Circuit's decision in *Umbenhauer*, provides no insight into the ultimate decision before this Court, since that case deals with service of process upon defendants principally located in Switzerland, a non-signatory country.

Thus, since the Hague Convention rules were inapplicable, the Third Circuit consulted the alternative provisions for foreign service detailed in Federal Rule of Civil Procedure 4.

Although neither the Supreme Court nor the Third Circuit Court of Appeals have addressed this issue, service by post has been held to be permissible under Article 10(a) of the Hague Convention by at least one New Jersey District Judge. *See Atzmon Plastic, Ltd. v. Gari Robbins Co., Inc., et al.,* Civil Action No. 94–6178(AET)(1996)(unpublished).

having obtained service of process by alternative means, would then be precluded from sending any post-service documents by postal channels. *See supra*, at 138 n. 13. This would certainly pose an undue burden on the judicial process.

Finally, defendant MMI's suggestion that "[i]t is not credible to argue that the United Kingdom would have consented to such a relaxed method of service as service by mail, given that the United Kingdom objected to the adequacy of more vigorous methods such as those provided in Articles 10(b) and 10(c)," is likewise unpersuasive. MMI Reply Brief at 8. Both Articles 10(b) and (c) provide for service of process through "judicial officers, officials, or other competent persons of the State of destination". Considering the Convention's stated initiative to "simplify" and "expedite" international service of process, it is at least equally probable that the United Kingdom's objection to these provisions was intended to avoid establishing additional complex alternatives, potentially involving their judicial officers or officials, for serving process. Read this way, it is entirely appropriate and consistent that the United Kingdom would permit service by mail directly to persons abroad as authorized under Article 10(a), as opposed to burdening its judicial officers with the role of an intermediary for service.

It is also noteworthy that following the United Kingdom's original consent to Article 10(a), Special Commissions, composed of representatives from the signatory states, including the United States and the United Kingdom, convened in 1977 and again in 1989 to discuss the practical effects of the Hague Convention. Upon reviewing the Permanent Bureau reports of these meetings, this Court finds no evidence that the United Kingdom sought to withdraw its consent to the applicability of Article 10(a), despite the controversy surrounding the scope of the rule. Certainly,

in light of the United Kingdom's awareness of the position taken by at least some of the United States Circuit Courts, that service of process by mail is permitted, if the United Kingdom disagreed with this interpretation of the rule, it would have clarified its position or withdrawn its consent to Article 10(a) entirely.[18] *See* Second Special Commission Report, 28 I.L.M. at 1561. Having failed to do so, this Court is left with the inescapable conclusion that the United Kingdom does not object to service of process by postal channels.

Based upon the foregoing, this Court finds that Article 10(a) of the Hague Convention empowers litigants to effectuate service of process through postal channels, provided that the State of destination does not object. As this Court has already noted, the United Kingdom, the State of destination in the instant case, did not object to Article 10(a), thereby rendering it applicable here. This Court must now determine whether EOI's service by post was adequate to provide sufficient notice to MMI of the pending litigation against it.

### 2. EOI's Service of Process

"Service of process must satisfy both the statute under which service is effectuated and constitutional due process." *Ackermann*, 788 F.2d at 838. Article 10(a) of the Hague Convention provides the statutory authority to transmit service of process through postal channels,[19] and the Supreme Court has long ago settled that service by mail satisfies due process requirements of adequate notice and an opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (upholding the constitutionality of service of process by mail).

█ Here, mail service is authorized, and as such, EOI's service upon MMI satisfies its service obligations under Article 10(a) of the Hague Convention which requires that ser-

---

18. Revealingly, the Permanent Bureau, in their report of the 1989 Special Commission, noted that Japan clarified its position regarding the scope of Article 10(a) and its effect upon service to Japanese defendants; however, the Bureau made no reference to any other nation having done so. Second Special Commission Report, 28 I.L.M. at 1561.

19. Having found that the Hague Convention is controlling here, the Federal Rules of Civil Procedure are therefore inapplicable. Thus, MMI's alternative argument pertaining to the applicability of *Fed.R.Civ.P.* 4(f)(2) is irrelevant to the instant discussion. *See supra*, at 135.

vice be sent directly to the person, or in this case the corporation, abroad. In *R. Griggs,* upon finding that service by mail was sanctioned under Article 10(a), the court applied the rule to hold that the mailing of the summons and complaint to the defendant corporation's Commercial President Commander at the corporation's offices in Italy via Federal Express was sufficient notice and proper service under the Hague Convention. *R. Griggs,* 920 F.Supp. at 1107. Thus, the court refused to quash plaintiff's service.

Like the plaintiff in *R. Griggs,* EOI's service upon MM provided defendant with sufficient notice of the pending litigation. EOI served the summons and complaint via DHL delivery, an express mail delivery service, to the private residence of Mr. Best, MMI's Managing Director, where it was received by Best's wife. Recognizing that the primary impetus for requiring service of process is "to create appropriate means to ensure that judicial and extrajudicial documents to be served abroad" are "brought to the **notice** of the addressee in sufficient time," this Court finds that EOI's service upon MMI's Managing Director is in compliance with the Hague Convention. Hague Convention at Preamble; *See also Volkswagenwerk,* 486 U.S. at 698, 108 S.Ct. at 2107.

In the instant matter, neither party disputes that MMI received actual notice of the pending litigation against it. Instead, MMI insists that EOI failed to comply with the technicalities involved in effectuating service. This Court is not swayed by this argument. Although Mrs. Best actually received the service documents, the package itself was addressed to MMI. Undoubtedly, Mrs. Best was aware that the package should be given to her husband, MMI's Managing Director. Hence, in light of the undisputed fact that MMI received actual notice, thereby satisfying the underlying purpose of the Hague Convention, this Court finds EOI's service of process valid and denies MMI's motion to quash service. Accordingly, MMI is directed to enter an appearance and Answer plaintiff's Complaint within thirty days from the date of this Order.